ELIZABETH A. STRANGE
Acting United States Attorney
District of Arizona

LON R. LEAVITT
Assistant United States Attorney
Utah Bar No. 11245
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Facsimile: (602) 514-7760
Lon.R.Leavitt@usdoj.gov

*Attorneys for the United States of America*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America *ex rel*. Ralph Vassallo and Laura Spahn, <br><br> Plaintiffs-Relators, <br><br> v. <br><br> Rural/Metro Corporation, *et al*., <br><br> Defendants. | CV-15-00119-PHX-SRB <br><br> **THE UNITED STATES OF AMERICA'S STATEMENT OF INTEREST ON DEFENDANTS' MOTION TO STRIKE RELATORS' AMENDED COMPLAINT** |

Defendants' arguments in their Motion to Strike filed on April 24, 2017 (Doc. 50) are factually and legally unsupported, and the Court should reject them. Courts—whose decisions defendants failed to cite—have expressly held that where governmental entities share investigative materials with *qui tam* relators, including cases in which governmental entities are expressly authorized by statute to issue a civil investigative demand ("CID") and share the responsive materials with relators, relators are permitted to use those materials to amend their complaint. *United States ex rel. Underwood v. Genentech, Inc*., 720 F. Supp. 2d 671, 680-81 (E.D. Pa. 2010); *United States ex rel. King v. Solvay S.A.*, No. H-06-2662, 2010 WL 2851725, at *1 (S.D. Tex. July 20, 2010). Thus, notwithstanding defendants' inflammatory labels, relators have not "poached," "usurped," "pirated," or "pilfered" anything (Doc. 50, pp. 2, 7, 11, and 14). Rather, they legally, appropriately, and

1  with the United States' permission used information defendants provided to the United
2  States—as defendants admit they were obligated to do (Doc. 50, p. 7)—in response to a
3  valid CID issued for a legitimate purpose as part of the United States' False Claims Act
4  ("FCA") investigation.

5  Consequently, defendants are incorrect in arguing that relators "have employed a
6  brazen, impermissible tactic" (Doc. 50, p. 2) by using information gleaned from
7  documents subpoenaed by the United States, given to the relators as permitted by statute,
8  and used by relators in amending their complaint.  Because defendants concede—as they
9  must—that such sharing is statutorily permissible (Doc. 50, p. 9, n. 4), defendants attempt
10 to mischaracterize the subpoenaed information as settlement communications protected by
11 Federal Rule of Evidence 408.

12 However, the information relators relied upon to plead the amendments at issue
13 was not provided as part of settlement talks and is not protected by Rule 408.  In addition,
14 even assuming settlement discussions were occurring, defendants may not render
15 inadmissible or out-of-bounds preexisting materials and documents they submitted in
16 response to the United States' subpoena.  This is because Rule 408 "cannot be read to
17 protect pre-existing information simply because it was presented to the adversary in
18 compromise negotiations."  Fed. R. Evid. 408, advisory committee's note.

19 Additionally, to the extent defendants insinuate that relators' claims lack merit
20 because the United States declined intervention, such an inference is unjustified, as several
21 courts have held.  *See, e.g., United States ex rel. Berge v. Bd. of Trustees of the Univ. of*
22 *Alabama*, 104 F.3d 1453, 1458 (4th Cir. 1997).  Accordingly, pursuant to 28 U.S.C. §§
23 517 and 518(b) and the FCA, the United States respectfully submits this Statement of
24 Interest as the real party in interest and requests that the Court deny the Motion to Strike
25 in its entirety.

26 / / /

27 / / /

28 / / /

# I.

## ARGUMENT

**1. Sharing CID Materials with Relators Is Expressly Authorized by the FCA.**

The FCA is "the government's primary litigative tool for combatting fraud against the federal government." *United States ex rel. Kelly v. Boeing Co*., 9 F.3d 743, 745 (9th Cir. 1993) (citation and quote marks omitted).  The FCA provides for the award of treble damages and civil penalties for, among other things, the presentation of a false or fraudulent claim or the making of a materially false record or statement to obtain payment from the United States Government. 31 U.S.C. § 3729(a)(1)(A) and (B).  Section 3730(b) of the FCA permits a private person, known as a "relator," to bring a *qui tam* action "for the person and for the United States Government." 31 U.S.C. § 3730(b)(1).  With certain exceptions, relators are entitled to a share of the proceeds of any judgment or settlement obtained in their *qui tam* actions. 31 U.S.C. § 3730(d).  The FCA also provides that the complaint shall be filed and remain under seal for at least 60 days after the complaint is served on the United States, along with "substantially all material evidence and information" in the relator's possession, while the United States investigates the relator's allegations and determines whether to intervene and prosecute the action.  31 U.S.C. § 3730(b)(2).

The FCA authorizes the Attorney General of the United States or a designee to issue a CID, a type of administrative subpoena, to "any person [who] may be in possession, custody, or control of any documentary material or information relevant to a false claims law investigation. . ." 31 U.S.C. § 3733(a)(1).  Recipients of CIDs are required to "make such material available." 31 U.S.C. § 3733(f)(2).  When a CID recipient fails to comply with a CID, the United States may file a petition to enforce the CID in the appropriate United States District Court. 31 U.S.C. § 3733(j).

/ / /

/ / /

/ / /

Pursuant to the CID provisions of the FCA, on January 8, 2015, the United States served a CID (No. 15-01) seeking certain documents from defendants.  A copy of the CID is attached as Exhibit 1.[1]  Defendants concede that the CID "required Rural/Metro to provide records and transport documents. . ." (Doc. 50, p. 7).  From February 15, 2015, to May 25, 2016, defendants produced documents and information in response to the CID, which the United States, in turn, shared with relators based on a determination that such sharing was necessary to the United States' investigation.  As defendants concede (Doc. 50, p. 9, n. 4), the FCA expressly authorizes this practice.  "Any information obtained by the Attorney General or a designee of the Attorney General" pursuant to a CID "may be shared with any qui tam relator if the Attorney General or designee determine it is necessary as part of any false claims act investigation."  31 U.S.C. § 3733(a)(1); *see also* 31 U.S.C. § 3733(l)(8) (materials responsive to CIDs may be used for "interviews of any qui tam relator" and "communications with . . . the counsel of other parties . . . concerning an investigation, case or proceeding").

Just because defendants do not like the fact that relators used information gleaned from CID responses in their Amended Complaint does not mean relators are prohibited from doing so.  Nothing in the CID provision—or any other provision—of the FCA restricts or prohibits relators from using information gleaned from CIDs in pleading their case, nor have defendants pointed to any statute or case law restricting or prohibiting relators' use of such information.

In fact, courts have stated just the opposite, expressly holding that relators may use documents produced by recipients of CIDs when amending complaints.  In *Solvay*, relators filed a *qui tam* action asserting FCA violations by defendants.  While the case was under seal, "both the State of Texas and the Commonwealth of Virginia issued a number of civil investigative demands compelling defendants to produce documents related to

---

[1]     Due to privacy concerns, Attachment B to the CID, which contains patient health information, is not included but will be provided to the Court under seal or *in camera* if necessary.

relators' allegations." *Solvay S.A.*, 2010 WL 2851725, at *1. "Texas and Virginia in turn shared the documents that were produced with relators' counsel, as authorized by the states' respective statutes." *Id*.

Relators then sought "to use the subpoenaed documents that were shared by Texas and Virginia as part of their third amended complaint." *Id*. Specifically, "relators ask[ed] the court to allow them to use the documents provided by Texas and Virginia so as to streamline the complaint and ensure that the necessary factual details are provided to survive a Rule 9(b) challenge." Rejecting the defendants' arguments against such use, the Court stated that the CID statutes at issue did not "describe what relators may do with the documents once disclosed to them." *Id*. The Court also relied on case law permitting the use of CID responses by relators, including Fifth Circuit precedent that "almost necessitates that relators be allowed to use the subpoenaed documents that were shared by the States in their amended complaint" to satisfy Rule 9(b). *Id*. Accordingly, the Court permitted the relators to use the materials defendants produced in response to the CIDs in order to amend their complaint and provide additional facts to satisfy Rule 9(b). *Id*.

Other cases are to the same effect. In *Genentech*, defendant made the same argument that defendants make here: "that the sufficiency of [a] relator's complaint must rise or fall on the basis of information in the relator's possession *prior* to receiving any discovery." *Genentech*, 720 F. Supp. 2d at 680. Accordingly, defendant objected in that case—as defendants do in this case—to amendments to relator's complaint that defendant believed were based on documents the Department of Justice had obtained earlier from defendant. *Id*. The district court flatly rejected this contention and defendant's related policy arguments:

> Genentech offers no authority—and I can find none—barring amendments based on discovery the relator obtained from the Government. Indeed, as I have discussed, courts have suggested just the opposite: that there is no need to relax the Rule 9(b) pleading standard in a *qui tam* case if the relator can incorporate into his complaint allegations based on discovery he has obtained from the Government. . . . Genentech thus asks me to disallow *qui tam*

1
2
3

> amendments purportedly based on documents that Relator obtained from the DOJ because those documents may have been provided to the DOJ by Genentech.  Once again, Genentech's request has no legal support.

4  *Id*. at 680-81.

5         The district court concluded that "requiring courts to bar amendments based on

6  evidence obtained indirectly from the *qui tam* defendant could effectively preclude any

7  discovery-based amendments, thus significantly impugning private enforcement of the

8  False Claims Act." *Id*. at 681.  Thus, the district court was unwilling "to write part of the

9  statute out of existence." *Id*.  Accordingly, the district court allowed the relator to amend

10  his complaint with information the United States obtained from defendant and then shared

11  with him. *Id*.; *see also United States ex rel. Banigan v. Organon USA Inc*., No. 07-12153-

12  RWZ, 2011 WL 794915, at *1 (D. Mass. Feb. 28, 2011) (noting authorities holding that a

13  relator may include in an amended complaint information learned from government

14  documents), 883 F. Supp. 2d 277, 293 (D. Mass. 2012) (documents produced in response

15  to Texas attorney general's CID, shared with relators, and then used by relators in an

16  amended complaint were not a public disclosure).

17         In an effort to conflate CIDs under the FCA with discovery tools under the Federal

18  Rules of Civil Procedure, defendants mistakenly argue that "[t]he same principles that

19  govern the use of information learned through discovery logically apply to government

20  subpoenas and CIDs with equal force" (Doc. 50, p. 13).  However, the cases cited by

21  defendants on this point are inapposite.  As defendants admit, these cases do not involve

22  or address information that a relator obtains indirectly from the United States during the

23  investigative/pre-intervention-decision phase.  *See* Doc. 50, p. 13 (recognizing the

24  distinction between cases involving "information learned through discovery" and

25  information gleaned from "government subpoenas and CIDs").  The decisions cited by

26  defendants declined to <u>relax</u> Rule 9(b) to <u>allow</u> discovery on a deficient complaint; they

27  did not rely on Rule 9(b) to preclude the pleading of facts learned pre-discovery.  *See*

28  *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006); *United States ex*

1    *rel. Clausen v. Laboratory Corp. of Am., Inc*., 290 F.3d 1301, 1313 (11th Cir. 2002);

2    *United States ex rel. Karvelas v. Melrose-Wakefield Hosp*., 360 F.3d 220, 228-31 (1st Cir

3    2004).[2]

4         Moreover, case law that <u>is</u> on point directly refutes defendants' argument, rejects

5    their proposed analogy, and draws a critical distinction between both the source of the

6    information (the government indirectly as opposed to the defendants directly) and the

7    method of obtaining the information (CIDs as opposed to discovery under the Federal

8    Rules of Civil Procedure).  *See Genentech*, 720 F. Supp. 2d at 680 ("[T]he authority

9    Genentech offers precludes only amendments to a *qui tam* complaint based on discovery

10   obtained *directly* from the *qui tam* defendant.  Genentech offers no authority—and I can

11   find none—barring amendments based on discovery the relator obtained from the

12   Government.  Indeed, as I have discussed, courts have suggested just the opposite. . ."); 

13   *Organon USA Inc*., 2011 WL 794915, at *1 (observing that defendants cited no case

14   holding that "there is an absolute bar on a relator ever using any government-subpoenaed

15   document to reinforce an FCA complaint" and "that other courts have either held or

16   expressly presumed that, in at least some instances, a relator may reinforce the complaint

17   with information obtained from government documents").

18         The cases cited by defendants are also inapplicable because they involve relators

19   who sought discovery because they wanted to use it to amend <u>in the future</u> to survive

20

21   [2]        In fact, several courts—including one in a *qui tam* case—have expressly allowed the pleading of facts learned during discovery.  *See, e.g., Remmes v. Int'l Flavors & Fragrances, Inc*., 453 F. Supp. 2d 1058, 1071 (N.D. Iowa 2006) (holding that Rule 26 "contains no prohibition on the use of the materials unearthed during discovery," that Rule 15 "contains no restriction on the use of information garnered through discovery in framing an amendment," and that defendants did not disclose—nor did the Court discover—"any legal authorities which would support such a limitation"); *United States ex rel. Knapp v. Calibre Sys., Inc*., No. 2:10-CV-4466-ODW, 2012 WL 1577420, at *2-3 (C.D. Cal. May 4, 2012) (relator may amend with information learned through discovery); *M.H. v. City of Alameda*, No. 11-2868 CW, 2012 WL 5835732, at *3 (N.D. Cal. Nov. 16, 2012) ("Courts routinely allow parties to amend their pleadings after new information comes to light during discovery."); *Fru-Con Const. Corp. v. Sacramento Mun. Util. Dist*., No. CIV.S-05-583LKKGGH, 2006 WL 3733815, at *5 (E.D. Cal. Dec. 15, 2006) (stating that "[a]llowing parties to amend based on information obtained through discovery is common and well established" and collecting supporting cases).

1    motions to dismiss, not relators (such as relators in this case) who already obtained

2    information and already used it to amend <u>in the past</u> before any motion to dismiss was

3    filed. Defendants' failure to distinguish between relators who want to <u>obtain</u> information

4    to <u>use</u>—rather than relators who want to <u>use</u> information they <u>obtained</u>—to amend a

5    complaint is fatal to defendants' argument on this point.

6          Moreover, contrary to defendants' arguments (Doc. 50, p. 13), CIDs are not

7    dependent upon—and do not need to be issued before—the filing of a *qui tam* case. In

8    fact, CIDs may be issued before, after, or even without the filing of a *qui tam* complaint.

9    *See Avco Corp. v. U.S. Dep't of Justice*, 884 F.2d 621, 623-24 (D.C. Cir. 1989) (the fact

10   that a relator has initiated proceedings under the FCA does not prevent the United States

11   from issuing a CID, and the United States' right to issue a CID is circumscribed only by

12   its intervention in an FCA case). In addition, CIDs do not "exist solely for the

13   Government's benefit" (Doc. 50, p. 13). This is clear from (1) 31 U.S.C. § 3733(a)(1),

14   which allows the United States to share CID-responsive materials with a relator; (2) 31

15   U.S.C. § 3730(b)(1), which permits a relator to pursue a *qui tam* action "for the person and

16   for the United States Government"; and (3) *Solvay*, *Genentech*, and *Organon USA Inc*.,

17   which endorse relators' use of CID and other materials they obtained from the United

18   States, including when such use is for amending complaints.

19         When, as in this case, the United States has a bona fide, legitimate use for a CID

20   and shares responsive information with relators, as it is expressly permitted to do by

21   statute, relators are not expected to "unlearn"—and, in fact, may use—information

22   gleaned from CID responses.[3]

23   / / /

24

---

25   [3]      Defendants also assert that relators' use of details learned from CID-responsive
materials is prohibited by Rule 9(b) (Doc. 50, p. 12). Rule 9(b), however, requires—not

26   prohibits—detailed information in a complaint. *See* Fed. R. Civ. P. 9(b) (stating what "a
party must state," not what it cannot state). None of the cases cited by defendants

27   supports their position on this issue. Moreover, defendants' argument turns Rule 9(b) on
its head by seeking to convert it into a substantive rule of evidence and prohibit the very

28   detail it requires.

**2.  The Amendments Came from CID Responses, Not Settlement Talks.**

Defendants admit that "[e]ach of the thirteen Patient Exemplars was included in the original 120-patient request" set forth in the CID (Doc. 50, p. 7).  Thus, it is not surprising that all of the factual allegations in the Amended Complaint that are of concern to defendants were gleaned from documents and information that defendants were obligated to provide—and did provide—to the United States in response to the CID.

The information defendants provided to the United States can be divided into three phases or groups.  The first group consists of the documents (primarily medical records, dispatch protocols, and bills) that defendants provided to the United States from February 3, 2015, through November 18, 2015.  Defendants admit that these materials were responsive to the CID (Doc. 50, pp. 4-5).[4]

The second group consists of the documents and information defendants submitted to the United States on March 30, 2016 (and re-sent on May 25, 2016) prior to the meeting on July 21, 2016.  Although defendants claim that these materials are protected by Federal Rule of Evidence 408 (Doc. 50, p. 5, ¶ 7), they are not.  The cover letter dated March 30, 2016, was accompanied by supporting information, virtually all of which defendants had already produced in response to the CID.  The only newly produced document was a cover sheet for patients in the CID that included new "Dispatch Information" that defendants should have produced earlier.  *See* Exhibits G, H, I, J, K, L, N, O, P to Motion to Strike, p. 1.[5]  That untimely-produced dispatch information, which is the only information relators

---

[4]      The contemporaneous communications between the United States and defendants make clear that defendants understood that the information produced through November 18, 2015, was responsive to the CID.  In a letter to defense counsel requesting additional information on September 29, 2015, counsel for the United States wrote, "The United States believes that most, if not all, of this information is within the scope of the civil investigative demand (number 15-01) served on Rural Metro on January 8, 2015. However, if you believe an additional subpoena for this information is necessary, please let me know so I can arrange to have one issued and served."  *See* Exhibit B to Motion to Strike, p. 1.  Defendants did not indicate any belief that the requested information was beyond the scope of the CID, did not suggest that an additional CID was necessary, and did not request that an additional CID be served.

[5]      Exhibit M did not include a cover sheet, any new dispatch information, or any other new information.  Defendants had already produced the entirety of Exhibit M in

1   relied on from the cover sheets, was called for by the CID, but defendants had not

2   produced it previously.  The untimely-produced dispatch information is squarely within

3   the scope of the CID, which called for, among other things, all "computer aided dispatch

4   (CAD) data and other dispatch records" relative to the patients listed in the CID.  *See*

5   Exhibit 1, p. 8, ¶ 1.g.[6]  As detailed in Section 3, *infra*, because the dispatch information

6   produced in 2016 is responsive to the CID, it is not a protected settlement communication,

7   and defendants cannot change the delayed, CID-responsive dispatch information into a

8   settlement communication by simply labeling it as such.

9          The third group is the documents defendants produced to the United States after the

10  meeting on July 21, 2016, which consist solely of the PowerPoint presentation defendants

11  used and presented at the meeting.  Although defendants reference "information

12  exchanged" at the meeting (Doc. 50, p. 6, ¶ 10), no documents were exchanged.  Rather,

13  defendants' counsel and company representative showed—but did not deliver copies of—

14  information.  Defendants' counsel emailed the PowerPoint presentation to counsel for the

15  United States on August 23, 2016.  However, because defendants did not provide a copy

16  of the PowerPoint presentation to relators' counsel and instructed the United States not to

17  share the presentation with relators or their counsel, the United States did not do so.

18  Therefore, relators and their counsel could not have received it prior to the Court's order

19  approving defendants' motion to seal it as Exhibit F to their Motion to Strike.[7]  Thus, even

20  assuming the presentation were protected by Rule 408, relators and their counsel did not

21  have the presentation and therefore could not have used it to draft the Amended

22  Complaint.

23  _____

24  previous productions responsive to the CID (as evidence by the Bates numbers all bearing
    2015 labels) and simply re-produced the same documents in 2016.  *See* Exhibit M.

25  [6]      In fact, the cover letter dated March 30, 2016, specifically references the CID.
    *See* Exhibit D to Motion to Strike, p. 1.

26
27  [7]      Although defendants claim they are "unaware as to whether the [PowerPoint]
    slides were subsequently provided to [relators or their counsel] by the DOJ" (Doc. 50, p.
    6, n. 2), the United States did not provide the presentation or any part thereof to relators or

28  their counsel and so informed defendants.

1    In several references, defendants improperly conflate CID responsive material with

2    the meeting in July 2016 in an attempt to bootstrap all the documents and information they

3    provided under subpoena over a year and a half to a single meeting at which a limited

4    subset of that information was presented and discussed.  *See* Doc. 50, p. 7 (admitting that

5    "[e]ach of the thirteen Patient Exemplars was included in the original 120-patient request"

6    set forth in the CID); *id*. (seeking to strike "allegations in the [Amended Complaint] that

7    are based on information provided to the DOJ before and during confidential settlement

8    negotiations") (emphasis added); *id*. (taking issue with relators' inclusion of "information

9    regarding particular patients for whom Rural/Metro produced medical records" that were

10   then "included by Rural/Metro in a PowerPoint presentation" used at the meeting in July

11   2016); *id*. at p. 11 (stating that defendants "provided [materials] to the Government as part

12   of its investigation into Rural/Metro's billing practices, and in contemplation of potential

13   settlement negotiations").

14   Defendants summarize their Rule 408 argument with a statement that confuses

15   their obligations under the CID with their hope or intention to settle the investigation from

16   which the CID came.  Defendants state that relators, in amending their complaint, relied

17   on information that defendants "provided to the Government in response to CID 15-01

18   with the intention of facilitating a resolution to the DOJ's investigation" (Doc. 50, p. 10).

19   This is an admission made fatal by its candor.  Defendants' "intention" to facilitate a

20   resolution and their "contemplation of potential settlement negotiations" by responding to

21   the CID, even if true, are irrelevant because the United States had subpoenaed the

22   information and defendants were required to provide it.  By improperly conflating their

23   obligations under the CID with their "intention" to facilitate a resolution or their

24   "contemplation of potential settlement negotiations," defendants advocate a rule that

25   would allow a CID recipient to unilaterally make a confidential settlement communication

26   of every responsive piece of paper by intending to settle any related investigation or case

27   at some point after responding to the CID.  This is not and should not be the rule.

28   / / /

1    As explained above and in relators' opposition and supporting declarations, the

2    information defendants are concerned about did not come from and has nothing to do with

3    settlement discussions; it came exclusively from documents and information responsive to

4    the CID.  Consequently, all of the information used to plead facts pertaining to the patients

5    at issue was derived from materials that defendants were obligated to produce in response

6    to the CID and, as discussed in Section 1 above, the United States permissibly shared with

7    relators and their counsel.

8            **3.  Material Responsive to CIDs Is Not Inadmissible or Off-Limits Simply**
9                 **Because It Is Disclosed While Settlement Discussions Are Occurring.**

10    All of the documents from which relators pled the allegations at issue either pre-

11    existed any settlement discussions (assuming discussions were occurring), were

12    responsive to the CID, or both, and such information may be permissibly disclosed to

13    relators and pled in their complaint.  The Advisory Committee Notes to Rule 408 explain

14    that "evidence, such as documents, is not rendered inadmissible merely because it is

15    presented in the course of compromise negotiations if the evidence is otherwise

16    discoverable."  Fed. R. Evid. 408, advisory committee's note.  "A party should not be able

17    to immunize from admissibility documents otherwise discoverable merely by offering

18    them in a compromise negotiation."  *Id.*; *see also Hallmark v. Cohen & Slamowitz, LLP*,

19    283 F.R.D. 136, 139-40 (W.D.N.Y. 2012) (denying a motion to strike purported Rule 408

20    information under Rule 12(f) because the information constituted a "pre-existing fact or

21    information falling outside the restrictions of Rule 408(a)(2)" that "could readily be

22    ascertained through discovery" and whose "establishment at trial does not depend on

23    admitting the [purported settlement] statements"); *Jeske v. Persolve, LLC*, No. 10CV1626

24    AJB WMC, 2011 WL 1897549, at *3 (S.D. Cal. May 18, 2011) (stating that "while

25    Federal Rule of Evidence § 408 prohibits the use of settlement negotiations, the

26    underlying facts disclosed during such exchanges which would otherwise be discoverable

27    are not protected").

28    / / /

Defendants appear to take particular issue with the dispatch information that they produced for the first time in 2016, in response to the CID, because they claim it was produced during settlement discussions.  However, even assuming settlement discussions were occurring, "evidence of facts disclosed during compromise negotiations is not inadmissible by virtue of having been first disclosed in the compromise negotiations." *Phoenix Sols. Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568, 584 (N.D. Cal. 2008).  This is true even though defendants' reason for producing the untimely-produced dispatch information may have been to facilitate a resolution; the information itself is not a protected settlement communication.  *See Ray Communications, Inc. v. Clear Channel Communications, Inc*., 673 F.3d 294, 306 (4th Cir. 2012) ("While the *reason* Clear Channel ceased using the name Tennessee Agrinet for one year (as a part of settlement efforts) may be inadmissible under Rule 408, the *fact* that it did so is not.").  Thus, the mere fact that defendants did not timely disclose certain dispatch information and then ultimately did so under the label of a settlement communication does not shield the underlying facts from being pled in relators' Amended Complaint.  There is no basis to strike the Amended Complaint or prohibit relators from pleading the allegations at issue.

### 4.  Non-Intervention Does Not Signal or Equate to a Lack of Merit.

In their Motion to Strike, defendants stated that the United States "relied on the very same information" that appears in relators' Amended Complaint "to conclude that Government intervention was not warranted in this case" (Doc. 50, p. 18-19).  To the extent defendants suggest that non-intervention somehow indicates a lack of merit to relators' allegations, defendants are incorrect.

Courts "do not assume that in each instance in which the government declines intervention in an FCA case, it does so because it considers the evidence of wrong doing insufficient or the *qui tam* relator's allegations for fraud to be without merit.  In any given case, the government may have a host of reasons for not pursuing a claim." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006) (the United States' "absence from the fray" does not mean that the relator's claims lack merit); *United States*

1    *ex rel. Rostholder v. Omnicare, Inc.*, No. CCB-07-1283, 2012 WL 3399789, at *15 (D.

2    Md. Aug. 14, 2012) ("The government's decision not to intervene in this case does not

3    suggest that the government necessarily believed that no FCA case was viable."), *aff'd*,

4    745 F.3d 694 (4th Cir. 2014).  "Non-intervention does not necessarily signal governmental

5    disinterest in an action," *United States ex rel. DeCarlo v. Kiewit/AFC Enterprises*, 937 F.

6    Supp. 1039, 1047 (S.D.N.Y. 1996); it signals that the United States is not intervening—no

7    more, no less.

8         As such, "[t]here is no reason to presume that a decision by the Justice Department

9    not to assume control of the suit is a commentary on its merits.  The Justice Department

10   may have myriad reasons for permitting the private suit to go forward including limited

11   prosecutorial resources and confidence in the relator's attorney."  *United States ex rel.*

12   *Chandler v. Cook County*, 277 F.3d 969, 974 n.5 (7th Cir. 2002), *aff'd*, 538 U.S. 119

13   (2003).  "Indeed, assuming the government looked unfavorably upon each *qui tam* action

14   in which it did not intervene would seem antithetical to the purpose of the *qui tam*

15   provision—to encourage private parties to litigate on behalf of the government."  *United*

16   *States ex rel. El Amin v. George Washington University*, 533 F. Supp. 2d 12, 21-22

17   (D.D.C. 2008) (the United States' investigation and/or inaction could not be used "as

18   evidence of how the government appraised the merits of the Relators' case" because,

19   absent "evidence tending to show the actual reason the government elected not to

20   intervene . . . the simple fact that the government did not intervene has no probative value

21   and is not relevant"); *see also Anderson v. McTish, Kunkle & Associates*, No. 4:CV-04-

22   754, 2006 WL 1985762, at *1 n.1 (M.D. Pa. July 13, 2006) (the court is "not permitted to

23   draw any inference from the decision of the United States not to intervene in this case")

24   (citing *Chandler*).

25        Moreover, the United States may obtain or be presented with information that

26   could cause it to seek to intervene at a later time.  The FCA provides that even when the

27   United States does not intervene at the outset of a *qui tam* action, the Court may "permit

28   the Government to intervene at a later date upon a showing of good cause."  31 U.S.C. §

1   3730(c)(3).  No statutory limit is placed upon the type of circumstances that will justify

2   intervention at a later date.  *United States ex rel. Sequoia Orange Co. v. Sunland Packing*,

3   912 F. Supp. 1325, 1348 n.29 (E.D. Cal. 1995).

4        Thus, a variety of factors have been held to establish good cause under section

5   3730(c)(3).  By way of example, good cause exists where (1) circumstances have changed,

6   *see Sunland Packing*, 912 F. Supp. at 1348; (2) the United States discovers additional

7   evidence during the course of its post-declination investigation, *see United States ex rel.

8   Stone v. Rockwell Int'l Corp.*, 950 F. Supp. 1046, 1049 (D. Colo. 1996); (3) the United

9   States realized that the alleged frauds were of greater magnitude than originally believed,

10  *see United States ex rel. Hall v. Schwartzman*, 887 F. Supp. 60, 62 (E.D.N.Y. 1995); and

11  (4) prosecution of the *qui tam* action could impede government efforts to achieve peace in

12  the relevant industry, *see United States ex rel. Sequoia Orange Co. v. Baird Neece

13  Packing Corp.*, 151 F.3d 1139, 1142 (9th Cir. 1998).

14       It is inappropriate for defendants to suggest that non-intervention reflects the

15  United States' views of the merits, for purposes of considering the Motion to Strike or for

16  any other reason.  Accordingly, the United States respectfully requests that the Court

17  decline to draw any merits-based inference from the United States' non-intervention.

18                                     **II.**

19                                 **CONCLUSION**

20       For the reasons set forth above, the Court should deny the Motion to Strike.

21       Respectfully submitted this 12th day of May, 2017.

22                               ELIZABETH A. STRANGE
                                 Acting United States Attorney
23                               District of Arizona

24                               s/ Lon R. Leavitt

25                               _____
                                 LON R. LEAVITT
26                               Assistant United States Attorney

27

28

1

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2017, I electronically transmitted the within and foregoing **THE UNITED STATES OF AMERICA'S STATEMENT OF INTEREST ON DEFENDANTS' MOTION TO STRIKE RELATORS' AMENDED COMPLAINT** to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants listed as counsel in this case.

 s/ Lon R. Leavitt
Office of the United States Attorney